**Blanca Suarez HERNANDEZ, Individually and as Administratrix of the Estate of Adam A. Suarez, Sr., Deceased, and as Next Friend of Adam F. Suarez, Jr. and Stephanie Rosanne Suarez, Minors; and Intervenors Gloria Reyna, as Next Friend of Adam Suarez and Angel Ray Suarez, Minors; and Abraham and Josephine Suarez, Parents of Adam Suarez, Sr., Deceased, Mary Esther Licerio as Next Friend of Roxanne Garcia, a Minor Child, Appellants,**

v.

**AMERICAN APPLIANCE MANUFACTURING CORPORATION, a Subsidiary of MOR–FLO Industries, Inc., Appellee.**

No. 13–91–082–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 6, 1992.

Rehearing Overruled March 5, 1992.

Paul J. Raleigh, Corpus Christi, for appellants.

Carlos Villarreal, Hunt, Hermansen, McKibben & Barger, Corpus Christi, for appellee.

Before NYE, C.J., SEERDEN and BISSETT,[1] JJ.

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

## OPINION

BISSETT, Justice (Assigned).

This is an appeal from a "take-nothing" judgment rendered in a wrongful death and survival action. Adam E. Suarez died as a result of burns sustained by him when flammable vapors of adhesive glue were ignited by the pilot light of a water heater. He was injured in the resulting fire on August 21, 1984 and died on September 14, 1984.

At the time of his death, Adam E. Suarez, hereafter referred to as "the deceased," was survived by the following persons, plaintiffs in the trial court and appellants in this Court, hereafter referred to as "plaintiffs," viz. Blanca Suarez (later Hernandez), widow of the deceased, Adam F. Suarez, Jr., and Stephanie Rosanne Suarez, minor children of the deceased by Blanca Suarez (Hernandez), Adam E. Suarez, Jr., and Angel Ray Suarez, minor children of the deceased by his first wife, Gloria, who prior to the death of the deceased had married Willie Reyna and who appeared in the trial court and appears in this Court also as next friend of Adam E. and Angel Ray, Roxanne Garcia, daughter of the deceased, who appeared in the trial court below and appears in this Court by next friend, Mary Esther Licerio, sister of the deceased.

Plaintiffs sued American Appliance Manufacturing Corp., a subsidiary of Mor–Flo Industries, Inc., hereinafter referred to as "defendant," for damages, alleging that a gas-fired domestic hot water heater was defectively designed and that this defective design was a producing cause of a fire which took the life of the deceased. Plaintiffs also alleged that defendant was negligent in the design, manufacture, and sale of the water heater, and was also negligent after the sale thereof.

Trial was to a jury; it found that the occurrence in question was caused by a design defect in the water heater. The jury failed to find a marketing defect with respect to the water heater and, likewise, found the defendant was not negligent in the marketing of the water heater. The jury did, however, find negligence as against the deceased, and apportioned causation ten (10%) percent to the defendant and ninety (90%) percent to the deceased. The total amount of damages awarded was $1,605,000, consisting of $205,000 for pain and mental anguish suffered by the deceased, for medical expenses incurred in the necessary medical and hospital care received by the deceased, and for funeral expenses for the deceased; $200,000 for pecuniary loss, mental anguish, and loss of companionship experienced by his wife; and $1,250,000 for pecuniary loss, mental anguish, and loss of companionship experienced by his children.

Before the case was submitted to the jury, plaintiffs settled with the co-tortfeasors and entered into a written agreement with defendant, which provided in relevant part:

> [A]fter determination under the verdict of what would be an appropriate judgment as far as all of the findings of the jury, that whatever amount is arrived at, at that time, will then be subjected to a credit and offset of $300,000 ...

As previously stated, the jury found that the negligence of the deceased caused 90% of the occurrence. Thus, under the pure comparative scheme established in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), the recoverable amount is ten percent (10%) of the total damages. In this case, ten percent (10%) of the total amount of damages in the verdict attributable to Mr. Suarez's beneficiaries would be $165,500. The trial court rendered a take-nothing judgment.

Because of the credit for the settling tortfeasors' contributions, the beneficiaries of the deceased would have had to have findings from the jury of damages in excess of $3 million in order for them to recover anything. Thus, there was a "cushion" of $1,345,000 which the jury could have found in pain and suffering, and still a take-nothing judgment would have been proper. Plaintiffs do not challenge this cushion argument except to say that it assumes that no amount of money was awarded for pain and suffering.

On August 21, 1984, the deceased was engaged in using a contact adhesive in installing a counter top in the kitchen of a house owned by Jesse and San Juanita Castilla at Victoria, Texas, assisted by a helper, Joe Albert Flores. Several other persons were also involved in different aspects of the renovation. About 3:30 in the afternoon, the formica glue was ignited by vapors from a water heater located in the kitchen. The deceased was set on fire. Flores, the only eye witness, saw the deceased trying to knock the glue off of his hands which were on fire and saw him slip repeatedly on the formica until more and more of his clothes were on fire.

After a brief hospitalization at DeTar Hospital in Victoria, Texas, the deceased was transported to a burn institute at Galveston, Texas. He was treated by Dr. David Herndon, Chief of Staff of the Shriner's Burn Institute.

When the deceased was first admitted to the Galveston burn hospital, he had burns over forty-five percent of his body. Dr. Herndon said that he had first, second, and deep second and third degree burns on his body. It was necessary that he undergo debridement in a tub to remove certain organisms deposited by dirt. Dr. Herndon stated that the deceased was conscious during this tubbing procedure although he had deep burns to both sides of his body and was being given fluids and oxygen as well as food through a naso-gastric tube, and further Dr. Herndon testified at length to the anguishing scrubbing process to remove dead and rotting skin and flesh to which the deceased was subjected every day; he described it as an extremely painful procedure during which patients usually scream or protest.

Dr. Herndon described the necessity for three different operations to excise skin contaminated by the aspergillus fungus, which he described as uniformly fatal in burn cases. He stated that it was necessary to remove more and more tissue and that during the course of these huge and long operations, the deceased received eighty (80) pints of blood. He also stated that although the deceased was asleep during the three operations, *"he was alert and oriented through all of his hospital course until the very end ..."* Dr. Herndon, in describing the kind of discomfort endured by the deceased during the course of his hospitalization at the Galveston hospital stated *"he was in extreme and tremendous pain throughout his hospital course. It is almost impossible to quantify that kind of pain."*

Plaintiffs contend in their first point of error that the trial court erred in overruling their motion for new trial "because the jury finding of $205,000 in response to the issue of damages to the estate is so clearly inadequate and contrary to the great weight and preponderance of the evidence as to be manifestly unjust."

Question No. 6, the damage issue to the estate, and the jury's answers thereto, reads:

What sum of money would have fairly and reasonably compensated Adam Suarez for—

Element a. Pain and mental anguish.

"Pain and mental anguish" means the conscious physical pain and emotional pain, torment, and suffering experienced by Adam Suarez before his death as a result of the occurrence in question.

Element b. Medical expenses.

"Medical expenses" means the reasonable expense of the necessary medical and hospital care received by Adam Suarez for treatment of injuries sustained by him as a result of the occurrence in question.

Element c. Funeral and burial expenses.

"Funeral and burial expenses" means the reasonable amount of expenses for funeral and burial for Adam Suarez reasonably suitable to his station in life.

Do not reduce the amount, if any, in your answer because of the negligence, if any, of Adam Suarez.

Answer in dollars and cents for damages, if any.

ANSWER: 205,000.00

Plaintiffs state in their brief:

The uncontroverted evidence ... was that the cost of medical care for Adam Suarez was $200,000.00 and necessary expense for his burial as $5,000.00. By necessary inference, the jury awarded zero for pain and mental anguish. We do not agree.

Concerning funeral expenses, the record shows:

1. Funeral expenses ...............$4,137
2. Two (2) cemetery lots ......... 500

$4,637

The record does not contain an itemized list or a summary of the medical bills. The only evidence relating to medical expenses is found in the testimony of Dr. Herndon, as follows:

Q. Have you also reviewed the charges and the expenses and costs that were incurred in attempting to save Mr. Suarez' life?

A. Yes, sir, I've reviewed the compilation here, and that is in front of me at this time.

Q. Rather than go through each individual bill and expense from the surgeons and the radiologists, the hospital, the anesthesiologist, could you give us the overall cost of the care and treatment that was rendered to Mr. Suarez.

A. Yes, sir. The total hospital charges that were listed here were 130,485, but that did not include surgeons' fees which are approximately 18,000 more; and there a pile other bills here that add up to another $10,000.

In summary, Dr. Herndon opined that the total in medical bills was "about $200,000."

 When a challenge to a jury finding is framed in terms of "factually insufficient evidence," or "against the great weight and preponderance of the evidence," the appellate court must consider all evidence in the case, both in support of and that contrary to the finding, to determine if the challenged finding is so against the great weight and preponderance of the evidence that it is manifestly erroneous or unjust. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Ford Motor Co. v. Nowak,* 638 S.W.2d 582,

585 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). If the court of appeals determines that the challenged finding was so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust, the finding should be set aside and a new trial ordered. *Cain,* 709 S.W.2d at 176 (Tex.1986).

Plaintiffs' arguments with regard to failure to award compensation for pain and suffering is similar to the appellants' argument in *Houghtling v. Dusch,* 413 S.W.2d 478 (Tex.Civ.App.—Dallas 1967, no writ). In *Houghtling,* the court explained appellants' argument as follows:

In their statement and argument under this point appellants contend that the jury, in answering the two special issues, awarded Mrs. Clarke and Mrs. Houghtling only certain itemized medical and other expenses and completely failed to award anything to either appellant for pain and suffering.

*Id.* at 480.

The Court, in answer to appellants' argument, said

[t]he jury was not called upon to render separate amounts for each element of damage claimed. Accordingly, it is impossible for us to state what portion of either of the sums so awarded by the jury in the respective special issues was awarded for any one element of damages. To do so would be to speculate upon the mental processes of the jury and this we are not allowed to do. Appellants' statement that the jury obviously granted damages solely for certain specified medical and other expenses and did not award anything for mental and physical pain and suffering cannot be supported in this record. Such statement is predicated upon an assumption which would of necessity be based on speculation or an interpretation of the mental processes of the jury not revealed by this record.

*Id.* at 480.

The court addresses appellant's contention in the above case by holding that the record failed to support this contention in

light of the fact that the damages for pain and suffering had not been segregated into a separate question to the jury. Upon consideration of the complete language in that opinion, we conclude that the court's statement with regard to lack of support in the record meant that because the damages were not segregated the record did not reflect a failure to award anything for pain and suffering.

In *Transamerica Title Ins. Co. v. San Benito Bank & Trust Co.*, 756 S.W.2d 772 (Tex.App.—Corpus Christi 1988), set aside by the Supreme Court pursuant to agreement, and remanded for judgment in accordance with settlement, 773 S.W.2d 13 (1989), the appellant was contending that he should not be liable for exemplary damages in tort. In that case the jury had found liability under both contract and tort theories, but there was only one question asking about the actual damages suffered by the plaintiff. This Court said:

> By point twelve, appellant alleges error in the lack of an independent jury finding of actual damages in tort. This point appears to correlate with the argument that the trial court should have segregated the components of damages in the issue it submitted, to insure that exemplary damages were not awarded for contractual injuries.
>
> We have reviewed the objections to the charge contained in the record, and find no request or objection seeking to relate the elements of damages to underlying theories of recovery. By failing to specifically object, appellant waived any error in the form of the submission. (Citations omitted).

*Id.* 756 S.W.2d at 776.

■ We apply the principles in *Houghtling* and *Transamerica* in the disposition of plaintiffs' first point. Plaintiffs did not object to the submission of Question No. 6 to the jury. Therefore, by failing to specifically object, they waived any error in the form of the submissions of the question, and cannot complain in this Court of the form of the question or the response by the jury.

However, assuming, *arguendo*, that there was no waiver, there are other reasons why the point cannot be sustained. Plaintiffs argue in their brief that the answer by the jury shows that it "awarded precisely the amount mentioned by attorney Hastings in jury argument for medical and funeral expenses," and, therefore, it is reasonable to conclude that no award was made for pain and suffering. We disagree. Specifically, the medical expenses, according to the *only* evidence presented to the jury, was in the total sum of $158,485, irrespective of Dr. Herndon's opinion that the total amount of medical expenses was "about $200,000." The funeral expenses, according to the evidence, was $4,637, not $5,000 as argued by plaintiffs' attorney to the jury. The medical expenses and funeral expenses, when added together, total $162,122, which, when subtracted from the amount of $205,000, leaves a balance of $42,878.

■ The arguments made by Hastings are not evidence. In addition to the argument of $205,000 as a reasonable award for medical expenses and funeral expenses, plaintiffs further argue that an award of $800,000 as reasonable compensation for pain and suffering should have been made. If the jury had awarded $800,000 for pain and suffering, plaintiffs would still be facing a "take nothing" judgment insofar as 10% of the total amount of the judgment, including the $800,000, would still be less than the $300,000 credit to defendant, provided in the settlement agreement with the co-tortfeasors. Therefore, any error committed by the trial court was harmless error insofar as any charge in the amount of damages which would have been awarded for pain and suffering ($800,000), since such award would lead to the rendition of the same judgment as was rendered.

Next, we review all of the evidence concerning pain and suffering experienced by the deceased. We have already summarized Dr. Herndon's testimony on this subject. But, there is other evidence with regard to the deceased's pain and suffering. There is testimony as to the use of pain medication to help the deceased deal

with the pain as well as certain episodes of unconsciousness which would mitigate any award for pain and suffering. There is evidence that he told his mother that he was not in too much pain.

As said by this Court in *Clark v. McFerrin,* 760 S.W.2d 822, 828 (Tex.Civ.App.—Corpus Christi 1988, writ denied):

A jury which has heard expert and lay testimony concerning damages may choose to be guided by this evidence but is not bound by it. *Keller Industries, Inc. v. Reeves,* 656 S.W.2d 221, 227 (Tex. App.—Austin 1983, writ ref'd n.r.e.). In fact, it is settled law that the jury may reject all or any part of the evidence concerning the alleged injuries, and the jury may determine the credibility of any and all of the witnesses and the weight to be given their testimony. *Hulsey v. Drake,* 457 S.W.2d 453, 460 (Tex.Civ. App.—Austin 1970, writ ref'd n.r.e.).

"Matters of pain and suffering are necessarily speculative, and it is peculiarly within the province of the jury to determine these matters and set the amount of damages." *Rodriguez v. Kvasnicka,* 710 S.W.2d 724, 727 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *see also, Leyva v. Pacheco,* 358 S.W.2d 547, 549 (1962).

In this case, plaintiffs cannot be upheld in their urging that no amount of money was awarded for pain and suffering because they cannot satisfy an essential factual predicate insofar as there was not a separate pain and suffering question. They have waived any complaint challenging the failure to award any compensation for pain and suffering. Moreover, if there has not been a waiver, the jury could determine the amount of medical and funeral expenses to be less than the $205,000, urged by plaintiffs and, therefore, it would be speculative to conclude that the jury awarded nothing for pain and suffering. Furthermore, there is evidence of probative value that will sustain a holding by this Court that the jury compensated for the deceased's pain and suffering in the light of plaintiffs' failure to conclusively prove that the medical and funeral expenses totalled $205,000; a significant portion of the award of $205,000 found in response to Question No. 6 can be allocated to pain and suffering.

▆▆▆ Since Question No. 6, which was submitted to the jury without objection by plaintiffs' attorney, and as the jury was asked to find damages, if any, for "pain and mental anguish," "medical expenses," and "funeral and burial expenses," the damages found by the jury were not segregated as to each element inquired about in the question. Therefore, no facts support plaintiffs' contention that the finding of $205,000 by the jury as damages in response to Question 6 represents *solely* compensation for medical and funeral expenses. A jury may, in its discretion award amounts of damages less than the amount proven. We cannot speculate upon how the jury arrived at the award of $205,000, nor can we assume that it found damages from some of the three (3) elements contained in the question and none from the others, or that it found some damages from each element. After a review of all the evidence, we hold that such award is not against the great weight and preponderance of the evidence that it is manifestly unjust. Accordingly, plaintiffs' first point of error is overruled.

Plaintiffs further contend in their second point of error that the trial court erred in rendering judgment on the verdict of the jury and in overruling their motion for new trial because there was no evidence that the deceased was negligent in accordance with the holding "in *Keen v. Ashot Ashkelon, Ltd.,* 748 S.W.2d 91 (Tex.1988)" and, in the alternative, that the finding of negligence (90%) on the part of the deceased was so against the great weight and preponderance of the evidence as to be manifestly unjust. We do not agree.

▆▆▆ In reviewing "no evidence" points, the court of appeals will consider only the evidence and inferences tending to support the jury verdict and disregard all evidence to the contrary and will affirm the judgment if there is any evidence of probative value to support the verdict in a jury tried case. *International Bank, N.A. v. Morales,* 736 S.W.2d 622, 624 (Tex.1987);

*King v. Bauer,* 688 S.W.2d 845, 846 (Tex. 1985); *Woodward v. Ortiz,* 150 Tex. 75, 237 S.W.2d 286 (1951). The standard to be applied to "no evidence" is whether such evidence, either direct or circumstantial, amounts to more than a mere scintilla. If there is more than a scintilla of evidence to support the finding, the challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). Applying these principles, we must first determine if there is evidence of probative value to support the trial court's judgment. If a no-evidence point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely and judgment rendered for appellant. *United States Fire Ins. Co. v. Carter,* 473 S.W.2d 2, 3 (Tex.1971); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). When both "no evidence" and "factually insufficient evidence" points of error are raised, the court should rule on the "no evidence" point first. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981).

■ We have previously set out the standard of review of an "against the great weight and preponderance of the evidence" point. We observe and follow that standard in disposing of plaintiffs' second point of error, wherein it is contended that the finding was against the great weight and preponderance of the evidence.

Viewing the evidence most favorable to defendant, the evidence was that the deceased was brushing flammable adhesive on a sheet of formica not more than six inches to a foot from a water heater, the door of which had been removed and the pilot light of which was still burning, when he was set on fire. He was working in a kitchen area which was ventilated through two adjacent open windows and a patio door. The deceased was "real worried" about glue and, in fact, had knocked a cigarette out of the hand of Joe Flores (his helper) on an earlier occasion telling him "if [he] didn't want to die to not light that cigarette."

A summary of all the evidence of the deceased's specific knowledge of the risk of ignition of the ignitable vapors from ad-

hesives by water heater pilot lights includes the following:

1. Mrs. Castilla, the owner of the property in which the fire occurred, explained the deceased was brushing adhesive onto formica six inches to one foot from the water heater.

2. Mrs. Castilla explained that she could not see how the deceased could have missed the pilot light; there was no door on the enclosure, and there was an open view of the pilot light when kneeling.

3. Mrs. Castilla also explained that she is certain that the water heater cycled off and on when the deceased was working there and that she was sure he could have heard the water heater cycling.

4. Joe Flores, the deceased's brother-in-law and co-worker, explained that the deceased knew that the water heater was there and instructed him to check the pilot light.

5. Mr. Flores testified that the deceased had much concern with regard to flames being around adhesives.

6. Mrs. Licerio, the deceased's sister, testified that when Mr. Flores laid formica in his sister's house, he made sure that the pilot light was out; he even removed the water heater.

7. Mrs. Licerio also testified that there was no question that her brother knew that the adhesive was dangerous around water heaters.

8. The deceased's father also testified with regard to the deceased's knowledge of the specific risks involved, that his son, in laying vinyl for him, made certain that the pilot lights on the stove and water heater were cut off before using the adhesive.

9. The deceased's father further testified that his son knew of the dangers of using glue around pilot lights.

10. The deceased's father also explained that his son would not rely on others checking pilot lights but that he would do it himself.

There was ample evidence before the jury that the deceased knew of the specific risk of ignition of adhesive vapors by water heater pilot lights; there is evidence that

he knew that the pilot light of a water heater should be extinguished before using flammable adhesives in its vicinity. The negligence of the deceased does not fit the definition of a "comment n type negligence" under § 402A of the Restatement (Second) of Torts, as argued by plaintiffs. That comment provides that negligent failure to discover or guard against a product defect is not a defense against strict liability. In *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984), the Texas Supreme Court explained that such negligence would not be considered contributory negligence for purposes of applying the comparative negligence scheme established therein. In the case now before this Court, the deceased knew he was taking a risk by using adhesives near a water heater without first extinguishing the water heater pilot light. Thus, the deceased cannot be said to satisfy the requirements of "comment n of § 402A," even though the jury found in their response to Question No. 1 that the design of the subject water heater was defective.

▮▮▮▮ Plaintiffs' argument that the deceased did not know of the specific risk of ignition of adhesive vapors by water heater pilot lights is not in accord with the above-cited testimony. Furthermore, it would make a nullity of the comparative causation scheme established *Duncan v. Cessna* for the above-described negligence to be ignored. Plaintiffs' argument in their brief that there was "no evidence that Suarez was aware of the particular defect which made the water heater dangerous and defective as described by Moore and Mandell" (plaintiffs' experts on the design of water heaters), would eviscerate the law allowing for contributory or comparative fault. If plaintiffs cannot be negligent unless they have the knowledge and awareness of an expert, then no plaintiff would ever be negligent.

The cases applying *Keen v. Ashot Ashkelon, Ltd.,* 748 S.W.2d 91 (Tex.1988), recognize that knowledge of the risk determines the applicability of "comment n" to the factual situation encountered in the particular case. In *Webster v. Lipsey,* 787 S.W.2d 631 (Tex.App.—Houston [14th Dist.] 1990, writ denied), the court explained:

> There is evidence that [the plaintiff] knew the ATC [i.e. the product] handled differently with a passenger and he testified to that effect. While he may not have recognized this as a design defect per se, his knowledge distinguishes this case from *Keen.*

*Id.* at 637.

Similarly, in *Mooney Aircraft Corporation v. Altman,* 772 S.W.2d 540 (Tex. App.—Dallas 1989, writ denied), the Court determined that the plaintiff's "interpretation of *Keen* [was] overly broad." *Id.* at 543. That court explained that the teachings in *Duncan v. Cessna Aircraft Company* continued in full vigor after *Keen* and explained that in *Duncan:*

> The court suggested that it is unfair and economically inefficient to ignore plaintiff misconduct in allocating accident costs. Therefore, the trier of fact should compare the harm caused by the defective product with the harm caused by the negligence of the plaintiff. Assumption of risk and misuse are no longer separate defenses, but are subsumed under the more familiar concept of contributory negligence. [para.] In our view, *Keen* does not overrule these teachings of *Duncan* and its progeny.

*Id.* at 543.

The *Mooney* Court held that a pilot who was unfamiliar with the aircraft and not instrument rated, who nevertheless flew in the dark after having flown for 20 hours, could validly be found to be contributorily negligent. Thus, the Court rejected plaintiff's interpretation that the pilot's failure was merely failing to discover or guard against the defects in the instrumentation of the plane. *Id.* at 544.

Furthermore, the court's holding in *Keen v. Ashot Ashkelon, Ltd.* should not be taken outside of its factual context. There, the plaintiff was injured when a defective sand shoe failed and injured Keen. In other words, the defect was latent and not associated with the reason why there was a safety rule not to pull alongside the trailer.

The difference between a latent defect and a parent feature of a product is what distinguishes this case from *Keen.*

With respect to the case at bar, if the water heater in question would have had a cracked leg, and this latent defect would have caused the water heater to fall upon the deceased causing him injury, then the case would fall into the *Keen v. Ashot Ashkelon* realm. However, in this case, the product feature in question is a pilot light which is a patent feature of a water heater known to the deceased. Hence, this case is distinguishable from *Keen* insofar as the type of latent defect involved in *Keen* is not the issue here. The alleged defect of the water heater is a patent feature of which the deceased had knowledge. *Keen* is not in point and plaintiffs' reliance thereon is misplaced. Plaintiffs' second point of error is overruled.

The judgment of the trial court is affirmed.